2350479 D.D.R. Weinert v. Ovintiv And we will hear first from Mr. Wehmeyer. Are you an oil and gas lawyer, Mr. Wehmeyer? I am, Your Honor. Good. Good. Also certified in civil trial law. May it please the court, Corey Wehmeyer for the appellants, D.D.R. Weinert. Here the district court should be reversed for the reason that it has for the first time in the history of national jurisprudence applied recoupment to a successor in title that did not receive the alleged overpayment. No time in the history of Texas law or national law has this been done before. For that reason, this court should reverse that judgment, which was granting a take-nothing judgment against the royalty underpayment claims of D.D.R. Well, let me just, you know, that's a very nice equitable way to put it, but Williams and Myers, I think, just takes note of the decision. It doesn't criticize it. Of this particular decision? Yes, sir. So what I would come back to is the doctrine of recoupment, and that often goes hand-in-hand with set-off and offset. With respect to each of those, they require identicality of parties. That is, the party that is doing the recouping or doing the setting off is also party to the transaction or a series of unrelated transactions with the overpaid party. Here, D.D.R. is separate and distinct from, not the same party as the Richters. Let me suggest to you this. This kind, and we did look in the treatises about this case. We couldn't find authorities directly on point, but you can help us with that. The treatises seem to say that recoupment is a venerable part of Texas oil and gas law simply because there are often instances, like what happened in this case, for which you accuse a vintive, but there are often instances, or that Adams case in the Texas Supreme Court, where there was a retroactive change in what the FPC, I think it was FERC, allowed. Anyway, that this is not an uncommon situation in regard to the relation between the operator and the royalty interest, and the operator often underpays or overpays royalties. The fact that this has never arisen before suggests to me that when you have arms-length transactions between an owner of a royalty interest and the successor, that somewhere in the documents in arms-length transactions, they will say, they will apportion who is liable in the case of any reimbursement by or recoupment by the operator. In these particular, I think . . . But this was not arms-length. I do want to make one point clear on the arms-length. If you look at the record, although it's been said that the Richters own the beneficial interests of DDR, that is nowhere in this record. So the idea that the Richters have somehow benefited from this . . . Well, I don't care whether it's them or their grandkids. They set it up for . . . the fact that you concede it's for estate planning purposes means that it's not arms-length. The standard here is not arms-length. What the district court did was effectively avail piercing. Well, wait a minute. Why can't the district court have traveled under the language of the deeds and the language of the division orders as relate to the leases? Because the new entities assume the leases, correct? Absolutely. They assume the lessor status under the oil and gas . . .  I mean, so they stepped in the shoes. But the division orders in particular talk about . . . I can't remember the exact language, but it talks about title disputes or adverse claims. And your briefing seems to read away adverse claims, that second clause. You say, well, this only relates to title disputes. That's not what the division orders say. So why couldn't we just travel under the documents as opposed to making this some earth-shattering case? Judge Wilson, I don't hide at all from the division orders. And I think they're very simple. It's one page. They are effective as of April 1st, 2018. And so what DDR promised under the division order is that for an issue that arises after April 1st of 2018, that is on the recurrent monthly payments, if there is a problem with their decimal entitlements, and I can quote the language, the undersigned agrees to indemnify or reimburse any amount attributable to an interest to which the undersigned is not entitled. DDR, after April 1st of 2018, was at all times entitled. The periods that they took the royalties from were from June of 18, September of 18, and October of 18. The Richters, the periods that they say the Richters were overpaid during, goes back to September of 2016, ending approximately of January of 2018. So what should have happened here then? I appreciate that question, Judge Wilson, because this is incredibly customary. I mean, the reason this is such a unique is that there's no law that supports what Oventa did. This is what they should have done. Under the division orders, they have a breach of contract action against the Richters. That's a four-year period of limitations. When they discovered this in January of 2018, they could have and should have sued the Richters for breach of the division order contracts that they had signed that covered the correct effective date and period for recovery. Additionally, they could have sued for money had and received. That's the other common remedy. Sometimes the oil company doesn't get those division orders signed under 91402 of the Texas Natural Resources Code. And in that situation, if they don't have that division order contract to rely on, equity permits them on a two-year period of limitations, and here in 2018, they were within that two years, to sue on equitable principles. Richters, you received money that in equity and good conscience belongs to us. The other thing they could have done was make this a fight between the actual, through some interpleader mechanism or otherwise, make this a fight between the allegedly underpaid parties and the allegedly overpaid parties. But let me, are you representing the Richters? I do not, Your Honor. So you're totally being paid out of the new LLCs? Yes, Your Honor. And you, except Mr. Richter is your client. Mr. Richter is not the client. As the manager of the LLC. And I think, Judge Jones, what this goes to is the improper veil piercing. Texas has always done this. This is not veil, excuse me. I was about to say the same thing. So I guess, let me follow up just if I could. They did all that. So a file suit in 18 gets a judgment against the Richters. Richters say we're not going to pay. Then they would have done a charging order, I guess, against Richter's, Mr. Richter's interest in these entities, right? In other words, they're going to end up right where they are, which is taking the money from the entity or preventing the entity from ever disbursing anything. What they would have done at that point would have, you would have recorded that judgment. You would have abstracted it in the county where the minerals are located. And at that point, it would have operated as a lien against the mineral proceeds that would have been subsequently severed. Well, I skipped a bunch of steps, I guess, but I'm just getting to the point that could they not have ended up with a charging order against his membership interest in this entity? With respect to the charging order, I don't think it would have applied to the entity because, again, there's no showing in this record anywhere that Mr. Richter as an individual owns any benefit. So they insulated against that eventuality. I mean, the problem with putting the fight between the overpaid and the underpaid is that here they're not arm's length. Back to Judge Jones's initial point. Well, again, to your question. Who's going to approve the suit with the DDR entities against the Richters? Mr. Richter? So he's going to sue himself? Again, with respect to the ownership of DDR, that is not in the record here. But he signed the documents. I mean, he signed the division orders. He clearly had authority to act on behalf of the entities at some point in time. And I wanted to make that point clear because the district court's order in judgment conflates who signed the division orders. The division order is signed by the entity DDR Williams. Obviously, that entity has to act through a human. And so in this instance, Mrs. Richter and Mr. Richter are the humans that signed it. They're the same humans who got overpaid the royalties. And Oventive had a cause of action and a remedy for that. Oventive chose to not pursue it. That remedy would have been breach of their division order contracts, not before the court. What do you do with the argument that recoupment is an equitable principle? And that seems to be what the treatises point out, that there isn't a whole lot of law about recoupment. But it's been a longstanding practice and custom in the oil and gas industry. It operates by essentially equitable principles. And playing through what Judge Wilson has just said, it's hard to see why recoupment against DDR isn't essentially, in the end, fixable between the non-arm's length entities. Your Honor, with respect to the recoupment mechanism, we embrace recoupment. And we publish papers on the recoupment principles. It is an equity doctrine. Never in the history of time has that equity recognized that you could charge an allegedly underpaid party, such as DDR, via a debt of an allegedly overpaid party like the Richter's. This is black-letter law that there has to be identicality of parties for recoupment or set-off or offset to apply. That's just full-stop period under the black-letter law. And that's not met here. Which is why they resorted to this argument about the subject to and as is clauses in the warranty deeds. If the court looks at these, and Judge Jones, this was one of your questions earlier, which is that oftentimes parties will provide in the conveying documents how debts and those types of things will be handled. These are incredibly simple one-page. That's because they were non-arm's length. With respect to arm's length, again, arm's length doesn't come to bear in any of the cases. None of the cases cited here does arm's length become a distinguishing factor. But in the deeds themselves, and again, these are simple one-page deeds. This is another, as we talk about the district court literally turning all real property and contract principles on its head with its decision. The subject to clause, looking at the Texas Supreme Court of Winsky v. Ely, is very clear that a subject to such as this does not pass a debt. The subject to is actually a protection for the Richter's that says, DDR, you can't sue me on the breach of warranty of title. You are acknowledging receiving this that there may be outstanding burdens against the actual land. That is the fee real estate. And so, for example, if there's an easement on Black Acre or if there's already an oil and gas lease on Black Acre. I don't understand how you're reading Winsky because that was a fight between the purchaser and the seller over a preexisting interest. And that's exactly right. So where does it say anything about so the Ely's were suing the Winsky's? So this business about the grand tour being protected is backwards from the facts there. The question in that case is if I give a warranty of title, I've warranted perfect fee simple determinable title. The only way I can protect myself against breaching that warranty for an outstanding interest like an oil and gas lease that encumbers the fee simple absolute title is through the subject to clause that says you are accepting the subject to these outstanding of record encumbrances. There's never been a court that would have said a subject to clause would also pass a personal debt. What if it's not a personal debt, though? This is an overpayment for minerals that were not yet removed, right? The minerals not yet removed, the interest in those would have passed with the deed and passed with the land, correct? No, Your Honor. Your Honor, for the reason that the record here controverts that, the very first time the idea is that these were prepayment of royalties came about in the responsive appellate brief of Oventive. This was not a prepayment. If the court looks at the actual record, it's about three inches thick. All of the recurring monthly royalty statements are part of that summary judgment record. What this purported to be was a royalty payment for each month for actual accrued production between September of 2016 and June of 2018. That's what the actual record showed. The idea that this would somehow pertain to unaccrued royalties, that this was a prepayment on unaccrued royalties is out. Well, it might be a bit of a fiction, but the theory would be that the minerals were not actually removed for which you received the payment. Therefore, you would treat an overpayment differently under Texas law as you would an underpayment. Your Honor, I think the case that would show that that line of reasoning that Oventive picks up is wrong is the Arcadia case. Basically, what was going on in Arcadia was that there was an oil and gas lease transaction. There was a purchase money due to the mineral lessor for the oil and gas lease. It never got paid in full. The oil and gas company sells the oil and gas lease, and then the successor gets sued. Hey, this oil and gas lease had a payment due for the bonus, and you're now holding the oil and gas lease that went with that bonus payment to sign the lease, and we haven't been paid. Pay us. The court there said that that does not run with the land. It's not a covenant running with the land. It doesn't attach to the land. No different from the analogy that you just provided via possibly there's future minerals that may be produced. So, should this question be certified to the Texas Supreme Court as to whether or not these overpaid royalties are personal or real? We don't know the answer. That's an outstanding question, Judge Clement, and we actually had discussion about that on our side. But here, if contract principles and real property principles are simply applied to this fact pattern, consistent with longstanding Texas law, there is only one result, and that result is that DDR cannot be encumbered by this. When did DDR file suit? I'm at my time, Your Honor. I know you are. The suit was filed in 2022, and I will give you the— Oh, 2022. So, in other words, DDR waited four years to file suit. It was less than four years before the suit was filed. There is no allegation that DDR— Well, less than four years after what? After the payments were taken out or deducted? Is that what you're saying? Yes. Less than four years. But less than four years than the first payment being taken out in June of 2008. Well, let me—for you when you come back on rebuttal, one thing I really—and I can't speak for my colleagues, but I hate to wade into issues that are novel and arguably important on a case where I have a deep sense that nothing is to be gained between the parties by making a broad rule with unanticipated consequences. I do not understand why this transact—we have 90 or 100 years of organized oil and gas law in Texas, which is some of the most difficult to me and complex and important law in the United States. And this case has never come up before. And therefore, what makes it so important in this case to issue what could be a ruling with unanticipated consequences? I look forward to coming back and answering that question. All right. Thank you. Thank you, Judge. Mr. Hogan. Thank you, Your Honors. May it please the Court, Chris Hogan on behalf of Apelli Inventive. Your Honors, on the record before you here today, Judge Rodriguez's summary judgment order can and should be affirmed on four separate independent bases, each of which could stand on its own. The first, going to Judge Wilson's questions that he had, is based on the language of the instruments at issue. If you look at the conveyance documents, the one-page documents or two-page documents, as opposed to, say, the 90-page purchase and sale agreement you might see in a more sophisticated transaction, you can see that those transactions are made subject to, the conveyances subject to, the leases, the royalty payments, and encumbrances or, in another deed, indebtedness. And so the fact here is that subject to, when it's being looked at here, we know that the appellants in this case claim they own the leases. We know the appellants claim they own the rights to the royalties. Well, if they took both of those through that instrument, through that subject to language, they also took the encumbrances and the indebtedness tied to it. Wenske says you read these deeds in their entirety. You don't snip out the word subject to. And when read in their entirety, the deeds absolutely support Judge Rodriguez. But that's not the only independent basis on which Judge Rodriguez's order can be affirmed. The lease language that exists in this case is critical. The lease makes clear that my client, a vintive, cannot be held liable for any additional burdens based on a change in ownership of the lease. Now, we heard earlier today, the appellants, they love recoupment. They think it works under Texas law. I agree. We all know that the undisputed evidence in this case is that a vintive did not recoup any more than it had overpaid. And so the only reason why a vintive might be liable is because the overpayments were for a different lessor than when the recoupment took place. That means that the liability on its own could only be based on a change in ownership, and the lease makes abundantly clear that that cannot be a basis for a vintive to be held to an extra burden. So if that's the case, if that's the argument that they're making, that the breach was my client's failure to make a second payment for those royalties, that in and of itself is not a violation of the lease because of that language. What if the transaction between the rectors and the new entities truly was arm's length? Could you have pursued recoupment? Based on the deed language that we have and the lease language here, yes. I do think the equitable recoupment argument, which is a third separate basis, that is something that the factors would change. They absolutely would change. But the deed language, the deed language is what it is. The transfer is what it is. And the lease language is what it is. But the deed language is simply between the two parties to the real property. Yes. Well, why is a vintive a third-party beneficiary of that? So a vintive doesn't need to be a third-party beneficiary to understand where it is the benefits and the burdens of that transaction go. When a party transfers its interest in a contract to another party, the original counterparty doesn't need to be a third-party beneficiary in order to recognize that transfer. Well, suppose it's my home, and exclude the materialman's laws. Suppose it's my home, and I've had a bunch of rewiring done in order to put the house on the market. And then the party's inspection has been done and, you know, whatever. But the purchaser buys the home, and the contract, the electrical contractor was never paid. Under what principle does the electrical contractor get to come after the purchaser for what the previous homeowner did? It would depend upon the terms that are actually in the underlying transaction. If it was the case that the way in which you had conveyed the house made clear that you had, in fact, conveyed the liability or the indebtedness to that contractor, then it actually would be the subsequent owner who also could be on the hook for those payments. But, again, how does the contractor who is a stranger to that transaction get the benefit of the party's allocation between themselves? It's no different than if you transfer a contract between, you know, if you have contract A between party A and party B, and party B assigns its interest in the contract to party C, party A, under Texas law, under Siegel v. Eland, can proceed against either party B or party C. It doesn't have to be a beneficiary to the agreement in order to recognize that the rights that they have under the contract can be asserted against the new holder of the contract, assuming the assignment was permitted. Why didn't you add the Richters to the Aventi counterclaim? So, in this instance, it was the statute of limitations. So it is a two-year statute of limitations for money had and received, which is the claim that the appellants in this case claim that we should have brought against the Richters, but by the time they actually chose to bring their lawsuit, those two years had elapsed. So if we had brought a money-had-and-received claim, it would have been defeated on limitations purposes. What's your answer to my question to opposing counsel about whether this issue should be certified? So I actually also don't believe this is one that needs to be certified. I think that there's universal agreement among the parties and among TexOGA that weighed in on our side on this that recoupment is permitted as a matter of Texas law, so there's no open question on that issue that we're seeking to have decided. This is just basically one tweak on what is otherwise a general principle that everyone agrees with, and if you look at the way in which equitable recoupment is permitted, and you look at the underlying case law, the principles that allow for recoupment when there's the same parties involved also allow for recoupment in this instance. So it's a different, yeah, but he says that recoupment like set-off requires identical parties. And that is not the case, actually, for equitable recoupment. So there is a difference between set-off, offset, equitable. What's your best case? So for equitable recoupment, it would be. . . Ray, no, regarding no, no identity of parties required. Well, I'm not aware of any case that actually says you do need to have identity. Well, that's what I'm saying. I'm not aware of any case that says one way or the other. This is a case, this particular instance, where there has been a transfer between two parties, and to the judge's point, a party that is the governing authority for the LLC, the managing member, the one that signed the documents, in those instances, there is not an instance that we have in the law that actually looks at this particular example. But the general principles of equitable recoupment, particularly from the W&T offshore case that Judge Clement was on the panel for, in that case, this Court looked and said the key identifying fact for recoupment is what is the underlying contract at issue? Not what are the underlying parties, not what are the underlying individualized payments, but what is the contract? In W&T offshore, it was the lease, and in this case, it's the lease too. The overpayments were made under the lease, and the recoupment was made for payments under the lease. Those are all the same principles that this Court applied in W&T offshore, and should be applied in this case as well too. The fact that this was a transfer to a non-arm's-length party is also incredibly important. If this Court, to Judge Jones's point, were to come up with what is essentially a roadmap for parties to basically avoid recoupment, it could have very, very material consequences for the industry. Parties are notified, just like the appellants were in this case, when recoupment is taking place. And frankly, even if they're not notified, people look at their checks when they come in the mail, and they see that their numbers have gone down quite a bit. If this Court creates a roadmap, what people will do is when they find out that recoupment is starting, which, as it did in this case, can take the course of months or sometimes even years, they're simply going to transfer it in a non-arm's-length transaction to their own affiliates, allowing themselves to keep the overpayments and to make the operator on the hook for double liability. But there's no evidence, is there, that that's what was happening here? In other words, there were innocent motives and estate planning objectives and things like that that were otherwise legitimate. Yes, and we've never said that it was actually a plan by the Richters here to do this. Now, I will say the Richters obviously signed the documents. They obviously know this is here. They could have cut a check to Aventive, and we never would have had this lawsuit. Well, they also could have, I guess, reimbursed the entities or let the entities fight among themselves and cut Aventive out of it. And the entity could very well go back after the Richters for the fact. I mean, that's the one thing that hasn't been stated is if these truly are separate parties, it may very well be the case that the Richters actually are going to be liable to DDR or to the appellants in this case. How much money is at stake now? About $600,000, a little more than $600,000. Still? Yes. And this is something where recoupment is an incredibly common event. It's something that our experts said, the appellants' experts said, TxOGA has said. The fact is in the oil and gas industry, there are restatements of volumes. There are restatements of indices that are being used for pricing purposes. There are invoices that are coming in. There are payments that are going out every single day. But under the statutes, my clients, just like all other operators in Texas, has to make payments quickly. They have to do it 60, 90 days. The only way that those two things can work in common is to allow for recoupment to exist because it allows my client, Eventive, to go out and actually make the correct payment, make it quickly, but when there is a restatement, to allow for adjustment to happen. The evidence shows that that's what happened here. The evidence shows that my client did not benefit in any way from the recoupment. The people that benefited from the recoupment were the underpaid royalty owners, all of whom have been made whole. My client recouped only the amount that it had overpaid, and my client paid the underpaid owners. In many instances, it is the case that an operator is unable to actually recover overpaid royalties. In the Hafer article that was cited by both parties, there's instances where parties either abscond with the money, spend the money, file bankruptcy, leave. The operators here are the ones that are, in fact, taking the risk. And Eventive here is in a situation where it is trying to make sure that those underpaid royalty owners get the compensation that they deserve, and they did that. The fact is that because there was a non-arm's-length entity transaction should not undermine those very important principles, which is why Tex OGA has come in here and said this is something that it's very important for this court to weigh in on and very important for this court to make sure that we don't create the opportunity for future lessors to avoid their obligation to return overpaid royalties by creating a roadmap to the contrary. I also do think that it's important that while the Texas Supreme Court has not addressed this exact issue on all fours, the Texas Supreme Court is on record in the Govinda case talking about division orders in particular to say that the outcome that they do not want is for double liability to be held on the operator when there is an improper overpayment. That's why we have division orders in the state of Texas. There are division orders here that are signed by the appellants. Those division orders say that the appellants are not entitled to, or to the extent that the appellants are not entitled to proceeds, that they are obligated to indemnify us for that. And Judge Rodriguez properly looked at those division orders when he supported his finding based on the language of the deeds. He's saying adverse claim, in other words. Yes, yes. Well, there's an adverse claim that exists, but then on top of it, there's an obligation that we be reimbursed or indemnified in the event there's proceeds that DDR is not entitled to, that the appellants are not entitled to. Those are the overpaid royalties. Well, their argument is that they were entitled to the royalties that accrued while they were the owner, less so. That's correct, Judge Jones. And so it does dovetail with the arguments that, in fact, they are not entitled to them because under both equitable recoupment in the language of the deeds, they are not entitled to receive payment that had already been made to their predecessors in interest. And the only change that happened was a non-arm's length transaction. Where's your specific language in the leases on which you rely? Certainly. The lease language is, well, the lease language I can read to you, it says, no change or division in the ownership of said land or other monies or any part thereof, however effectuated, shall increase the obligations or diminish the rights of the lessees. And that language, just to make sure that I have the page site where you are, that language can be found in Paragraph 8 of the Record on Appeal 236 to 237, along with several other parts because there's multiple leases that all contain identical language. And so this is an instance where, based on the evidence in the record, there are multiple ways in which this court can affirm Judge Rodriguez. It does not rise or fall with the deed language, although we believe that the deed language unequivocally supports us here. It does not rise or fall with the lease language, though the lease language supports us here. And it does not rise or fall only on equitable recoupment, which we believe also supports us here. This court in the Alliance for Hippocratic Medicine versus the U.S. Food and Drug Administration said, the court's exercising equitable power should be held to account for the real boots-on-the-ground circumstances, not those supposed or theorized by the parties. So this is not a situation where anyone is asking for a piercing of the corporate veil. In the district court, we did not ask for that. The judge said he expressly did not do that. But there is a difference between piercing the corporate veil and between recognizing the real boots-on-the-ground circumstances, as opposed to those supposed or theorized by the parties. And those boots-on-the-ground circumstances here show that at the end of the day, the plaintiff or the appellants in this case are standing in the shoes in a non-arm's-length transaction of the party that received the overpayments. Well, are you an oil and gas lawyer? I'm on the Texas State Bar for the Oil and Gas and Natural Resources Council. I'm on the Pattern Jury Charge for the Oil and Gas— Let me ask you a question. Ordinarily, in the transfers of ownership among mineral interest owners, would there be language more specific about the accrual of the burdens of overpayments and underpayments? Typically, yes. In most of the cases that I handle, you're dealing with parties that are not arm's-length. I understand that. So are there form—I know there are form contracts. Where are they? I'm not aware of a form contract that necessarily does this, but most purchase and sale agreements make very clear that there are liabilities and there are assets that exist prior to the time of sale and after the time of sale and allocate who's responsible for those. So in an instance where you're going to have, say, a Chevron transferring to Exxon, they're going to make it clear. It's going to be in the contract. Well, and does the fact that—does this distinction between realty and personality figure into how we ought to construe these documents? So I don't believe this Court needs to get into that issue because of the deed language and because of the equitable recoupment issue because the deed language here, although it's only a one- or two-page document, the deed language transferring the leases and transferring the royalty interest, transferring the encumbrances, that, separate and apart from general deed principles, answers the question. But the Phillips case, which is the case talking about the personal property versus real property issue, which I should note was literally never cited or brought up in the district courts. Adams, you mean, or Phillips? Phillips Petroleum versus Adams I think is— Yeah. So that case, which is being—it's ironic that we're being complained about for not bringing this up until our appellee's brief when the reason is it was never brought up in the district court whatsoever. This is a brand new and thus forfeited argument. So the first time we could bring it up was our appellee's brief. But in the Phillips Petroleum case, there is a distinction between property that is— oil and gas that is severed and oil and gas that is not severed. Right. But when you look at the further cases, for instance, Anadarko versus Clear Lake Pines, which is one of the cases that the appellants cite in this case, it makes it clear that the severance needs to be for the oil and gas at issue. Here's the language that the court uses at Penn State Asterix 3. It's a Westlaw case. It follows that the royalties become interests in personality at the time the minerals for which they are owed become personality. So it's not the fact that there may have been a severance of minerals elsewhere. What matters is, was there a severance of minerals here for those overpayments that actually existed on the Richter's and then later the appellant's property? That did not take place. So instead, what it is is a right to future royalty payments, which is an interest in land. That is a direct quote from the Texas Supreme Court in Clyde versus Hamilton, 414, SW 2nd, 434, and then also later followed up with the Sabine Production Company versus Frost National Bank of San Antonio, 596 SW 2nd, 271, saying a right to a future royalty payment is an interest in land. So Phillips, again, forfeited and not material because of the deed language, but say we had no deed language and say they had actually made this argument in the district court, we would still prevail because it is not a severed piece of oil and gas from that property that was being paid. Instead, it was royalties that would be in the future for future oil and gas production. But again, that's a fiction. My exchange with counsel opposite, I mean, that's not what was really argued here, the conceptualization of this. It would just be a fiction for trying to solve the case. Essentially, yeah. I'd be having to categorize this one way or the other, and it's something, again, the court need not wade into, but the courts that have talked about this do maintain that it needs to be oil and gas on the property. That's how they're discussing it as opposed to a future right. My time is up if there's no further questions. Okay. Thank you. Thank you, Your Honors. All right. Mr. Wehmeyer. Thank you. I'll pick straight back up with your question earlier, Judge Jones, and it goes to Judge Clement, which you had asked on earlier about certifying the question. This only becomes the novel first-of-its-kind issue if the court decides to set aside over a century of settled black-letter law in Texas on contract principles and real property principles. If the court reverses the district court, as it should, setting aside the take-nothing judgment, this court has done nothing more than follow the clear black-letter law. The court asked counsel, what is the case that says you don't have to have identicality of parties? There's no such case. Michael Jones is the former head of the oil and gas section of the State Bar of Texas. His expert report is in the summary judgment materials and in the record unobjected to. And Mr. Jones talks through the recoupment and the requirement that whether you call it equitable recoupment or set-off or offset, it all requires identicality of the parties, and that's grounded in the reason that, as a matter of equity, you can't go do equity against a party, here DDR, who did not receive the overpayment. DDR was not unjustly enriched. On the best day, OVENTA would make the case that the Richters were unjustly enriched, and the only way you cross those or meld them is through some type of a veil piercing. Well, if this is 100 years, why is the Texas Oil and Gas Association weighing in on the other side? Obviously, Texoga is going to be very interested in securing an opinion out of this court that allows it to grab and take from successors in title who had no knowledge about any problems, who had not a burden that runs with the land, no division order that provides for this, no instrument of title. Texoga would love, as an industry matter, the right to grab from. What about this provision in the lease that he's talking about, that OVENTA is not liable for any additional burdens based on ownership changes? I'm glad the court asked that question because what that provision is aimed at, that's typical of a producer's ADA. If you just go look at the foreign oil and gas lease, you're going to see that clause. What that's speaking to is if you have a whole of black acre and the lease covers the whole of black acre and then you divide it, you chop ownership or make some kind of a divided ownership within it, they don't want folks saying, well, now you're draining me or there's a failure to develop over here. Basically, what that's saying is subsequent changes in ownership doesn't make these internal divisions within the oil and gas lease that increases some of these implied covenants that go under the oil and gas lease. But to bring it back to contract principles, the recoupment of which counsel speaks does not come out of the oil and gas lease. This idea of grabbing it back, that's nowhere in here contractually. And so even if you indulge their argument, we have not in any way expanded or enlarged or diminished the rights of OVENTA under the oil and gas lease because this whole process that they're speaking to is extra to the lease. It's coming out of principles like the division order contract under 91402. But the essence of that is this realty and personality distinction, right? Is that what you're saying? No, Your Honor. I'm going straight back to the actual terms of the oil and gas lease. And the oil and gas lease provides in no way, shape, or form for any kind of recoupment. And so when they say that the argument goes now. . . Well, that's because it's equitable. It's not contractual. Exactly, Your Honor. And so, again, their argument is self-defeating because we haven't enlarged or expanded their obligations under the lease because what they fuss over is extra to the lease, sounding inequity, having nothing to do with the lease terms. On the counsel mentioned, the forfeiture piece, and we spend a lot of ink in our reply papers on that. I have two cases that I came across yesterday in preparing that I think just go straight to it and probably makes this easier. Lampton v. Diaz, 639 Federal 3rd 223 from this court in 2011. And specifically in that one, it's going to be footnote 14. And additionally, this court writing in Walker v. South Central Bell Telephone, 904 F. 2nd 275, 1990, this court writing, that will be footnote 1. Basically, those cases just in very simple fashion say, if the district court ruled on this basis and you're fussing over what the court ruled on, that is never waived. You can always take that up on appeal. And so those two cases are a more succinct place. On the conversion count, the court doesn't need to reach conversion. DDR is satisfied that judgment could be rendered dismissing the conversion count. And we're satisfied with that. And so we don't need ink on that. If there are no other questions, I very much appreciate the court's time. Okay. Well, thank you very much. We'll take this under advisement. Court will stand.